James D. GREEN, et al., Plaintiff,

v.

Ann E. VENEMAN, Secretary of Agriculture of the United States, Defendant.

No. CIV. A. 3:00CV366LN.

United States District Court, S.D. Mississippi, Jackson Division.

April 2, 2001.

A. Spencer Gilbert, III, James L. Robertson, Paul E. Barnes, Wise, Carter, Child & Caraway, Jackson, MS, for Plaintiff.

Rupa Bhattacharyya, U.S. Department of Justice, Civil Division, Washington, DC, Carlton W. Reeves, Pigott, Reeves, Johnson & Minor, P.A., Robert G. Anderson, U.S. Attorney's Office Criminal Division, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on the motion of defendant Ann E. Veneman, Secretary of the United States Department of Agriculture,[1] to dismiss plaintiffs' amended complaint or, in the alternative, to transfer venue. Plaintiffs have responded in opposition to the motion and the court, having considered defendant's motion, concludes that plaintiffs' complaint fails to state a cognizable claim for relief and accordingly should be dismissed.

Plaintiffs in this case are 147 "non-African American farmers" who complain that the United States Department of Agriculture (USDA or Department) has discriminated against them on account of their race by denying to them certain benefits that the Department has agreed to make available to similarly situated African American farmers. Plaintiffs charge that the USDA's discriminatory actions violate the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et seq.;* 42 U.S.C. § 1981 and § 1982; Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq.;* and the guarantee of equal protection afforded by the Fifth Amendment to the United States Constitution. In addition, plaintiffs have asserted claims under the Administrative Procedures Act, 5 U.S.C. §§ 551–559, 701–706, relating to applications for loans and loan servicing which they contend the USDA arbitrarily and capriciously denied.

*Pigford v. Glickman:*

Although plaintiffs declare in their responsive memorandum that "[i]t would be easy enough for [them] to state their claims [in this case] making no mention of a case called *Pigford v. Glickman,*" that plainly is not the case, for *Pigford v. Glickman* is at the heart of this case. This case

---

1. By order dated January 26, 2001, current Secretary of Agriculture Ann E. Veneman was substituted as defendant in place of former Secretary of Agriculture Daniel R. Glickman in his official capacity. A question arose between the parties as to whether the plaintiffs had sued Mr. Glickman solely in his official capacity as Agriculture Secretary, or whether he had also been sued in his individual capacity. It was ordered that Mr. Glickman would remain a party to the action and subject to the jurisdiction of this court for any purposes related to this action. In view of the court's disposition of the present motion, no resolution is required as to the question whether Mr. Glickman remains a proper party.

exists only because of *Pigford v. Glickman* and thus it is only with knowledge of what transpired in *Pigford* that one can understand the source of plaintiffs' claims against the USDA in this case, and likewise, only with a full understanding of *Pigford* is it possible to reasonably evaluate the viability of the claims of the plaintiffs herein.

*Pigford* was brought as a class action in the District Court for the District of Columbia by a class of certain African American farmers who alleged that they had been subjected to race discrimination in the USDA's administration of its loan programs in violation of, *inter alia,* the Equal Credit Opportunity Act.[2] Following certification of the plaintiff class in *Pigford,*[3] the parties undertook settlement negotiations which ultimately culminated in a settlement and the entry of a consent decree by the court following a "fairness hearing" as provided by Rule 23 of the Federal Rules of Civil Procedure.[4] The consent decree

2. As summarized by the Secretary in her brief in support of her motion to dismiss,

> The USDA, ... through the Farm Services Agency (FSA) ... is authorized to make various types of low-interest loans, including farm ownership loans (for the purpose of obtaining, enlarging or improving farm property), operating loans (which "provide the credit and management assistance necessary for farmers ... to conduct successful operations," 7 C.F.R. § 1941.2), and emergency disaster loans (to cover losses so that a farmer can resume operations after an officially declared disaster) to farmers who are otherwise unable to obtain credit from commercial sources. *See* Consolidated Farm and Rural Development Act, codified at 7 U.S.C. §§ 1922, 1941. Eligibility requirements for these loans are set forth in federal regulations, *see, e.g.,* 7 C.F.R. §§ 1941.2, 1941.6, 1941.12(a) (operating loans), 1943.2, 1943.6, 1943.12(a) (farm ownership loans), as are the terms and conditions upon which such loans are approved. *See generally* 7 C.F.R., Subchapter H. Borrowers who are unable to meet the terms and conditions governing repayment of their loans may apply to FSA for various forms of "primary loan servicing," *see* 7 C.F.R. §§ 1951.902(b), 1951.906, 1951.909, or "debt settlement." *See, e.g.,* 7 C.F.R. §§ 1956.54, 1956.57(b). Should these servicing efforts fail, FSA is authorized to institute foreclosure or other legal proceedings in order to discharge the borrower's debt to the public fisc. *See, e.g.,* 7 C.F.R. § 1900.2(k). FSA is also authorized to administer a variety of farm benefit programs previously handled by the Agricultural Stabilization and Conservation Service ("ASCS"). *See, e.g.,* 7 C.F.R. Part 713. These benefits programs do not involve the extension of credit, and FSA does not expect repayment from the recipients of such federal funds.

3. The *Pigford* court's initial opinion on class certification appears at 182 F.R.D. 341 (D.D.C.1998).

4. As the *Pigford* court recognized,

> Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled or compromised without the approval of the Court. Rule 23(e), Fed. R.Civ.P. Before giving its approval, the Court must provide adequate notice to all members of the class, *id.,* conduct a "fairness hearing," and find, after notice and hearing, that the "settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Thomas v. Albright,* 139 F.3d at 231. In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.

185 F.R.D. at 98. The court explained that "[i]n this circuit (the D.C. Circuit) there is 'no obligatory test' that the Court must use to determine whether a settlement is fair, adequate and reasonable." *id.* (citing *Osher v. SCA Realty I, Inc.,* 945 F.Supp. 298, 303–04 (D.D.C.1996)), and "[i]nstead the Court must consider the facts and circumstances of the case, ascertain what factors are most relevant in the circumstances and exercise its discretion in deciding whether approval of the proposed settlement is fair," *id.*

> By far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery that plaintiffs would realize if the case went to

provided for the creation of a two-track mechanism to resolve the discrimination claims of individual class members. *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999). Any claimant who would elect to proceed under Track A, in order to prevail, would be required to submit to a neutral adjudicator "substantial evidence" that he was the victim of race discrimination, a burden which he could meet by showing that he applied to the USDA for a loan or sought loan servicing and that the loan was denied, provided late, approved for a lesser amount than requested, encumbered by restrictive conditions, or USDA failed to provide appropriate loan service, and such treatment was less favorable than that accorded specifically identified, similarly situated white farmers, as a result of which the plaintiff suffered economic damage. *Pigford*, 185 F.R.D. at 94. If the adjudicator were to find that the claimant had sustained his or her burden to present "substantial evidence" of discrimination in a credit transaction, then in accordance with the terms of the consent decree, the claimant would be entitled to receive

(1) a cash payment of $52,000; (2) forgiveness of all debt owed to the USDA incurred under or affected by the program that formed the basis of the claim; (3) a tax payment directly to the IRS in the amount of 25% of the total debt forgiveness and cash payment; (4) immediate termination of any foreclosure proceedings that USDA initiated in connection with the loan(s) at issue in the

claim; and (5) injunctive relief including one-time priority loan consideration and technical assistance.

*Id.* at 94. If the adjudicator were to find in the claimant's favor and the claim involved discrimination in a benefit program, "the claimant [would be entitled to] receive a cash payment in the amount of the benefit wrongly denied and injunctive relief including one-time priority loan consideration and technical assistance." *Id.*

The consent decree provided a Track B alternative for plaintiffs with more extensive documentation of discrimination. *Id.* at 94. For Track B claimants, after a period of time for discovery, an arbitrator "[would] hold a one day mini-trial and then decide whether the claimant ha[d] established discrimination by a preponderance of the evidence," *id.*, and if, following that mini-trial, the arbitrator were to find that the claimant had shown by a preponderance of the evidence that he was the victim of racial discrimination and that he had suffered damages from that discrimination, the claimant would be entitled to actual damages, the return of inventory property that was foreclosed and other injunctive relief, including a one-time priority loan consideration. *Id.* at 97.

*Plaintiffs' Claims Herein*

In the wake of the court's approval of the class action settlement in *Pigford*, the plaintiffs herein, 147 "non-African American farmers," filed a class-action complaint in this court charging that as a result of

---

trial. *See Thomas v. Albright*, 139 F.3d at 231 ("The court's primary task is to evaluate the terms of the settlement in relation to the strength of plaintiffs' case"); *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir.1996) ("the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration"); *Maywalt v. Parker and Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2nd Cir.1995) ("[t]he primary con-

cern is with the substantive terms of the settlement: Basic to this is the need to compare the terms of the compromise with the likely rewards of litigation") (internal citations and quotations omitted). *Id. See also Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 813 (5th Cir.1989) ("Ordinarily, some proceedings, or at least 'familiarity with the litigants and their strategies, positions and proofs' are required" to assess whether settlement is fair, adequate and reasonable).

the settlement in *Pigford,* they are now the victims of unlawful race discrimination by the USDA. In a nutshell, these plaintiffs allege that from 1981 through 1996, the period of time covered by the consent decree in *Pigford,* they were subjected to the very same abusive treatment of which the plaintiff class of African American farmers complained in *Pigford,* and yet the USDA, by virtue of the *Pigford* settlement, has chosen to favor only African American farmers by agreeing to extend to them remedial credit opportunities which are not also being extended to "non-African American farmers" who experienced the same mistreatment. Plaintiffs contend, therefore, that because of the Department's racial discrimination in the administration of its loan and benefits programs, they are entitled to declaratory and injunctive relief requiring the USDA to provide to them access to the same benefits as have been extended to the plaintiff class in *Pigford.*

## The Secretary's Motion

In its motion, defendant submits that for reasons of judicial comity, this court should dismiss plaintiffs' complaint altogether or should, alternatively, transfer the case to the United States District Court for the District of Columbia in the interest of justice pursuant to 28 U.S.C. § 1404(a) so as to avoid interference with the continuing jurisdiction and remedial authority of that court. Defendant reasons in this regard that plaintiffs' complaint is an obvious challenge to the court's decree in *Pigford* and that consequently, plaintiffs' claims must be, or at least should be, addressed to the court which entered the *Pigford* decree. Defendant urges further, though, that should the court not be inclined to divest itself of the case on comity grounds, the court should dismiss the case for a more fundamental reason, namely, that it fails to state any claim upon which relief can be granted and is thus subject to dismissal under Federal Rule of Civil Procedure 12(b)(6). Because the court agrees that the complaint fails to state a viable claim for relief, the court concludes that defendant's motion is well taken.[5]

5. Plaintiffs' discrimination claims appear as Counts I, II, V, VI, VII and VIII of plaintiffs' complaint. Count I seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. In Count II of their complaint, plaintiffs allege a violation of the ECOA, 15 U.S.C. § 1691, which prohibits discrimination on account of race in "any aspect of" a credit transaction by a "person who regularly extends, renews, or continues credit[.]" Plaintiffs charge that each procedural or remedial opportunity that the USDA "is now so preferentially providing to the African American farmers is an 'aspect of a [farm] credit transaction' within ECOA." In addition to the other arguments for dismissal which are addressed in the text, defendant contends that the ECOA count is due to be dismissed since the *Pigford* consent decree, which is at the heart of plaintiffs' case, is not a credit transaction, or an aspect of a credit transaction of any sort, but is simply a decree that enables the *Pigford* class members to have their claims of race discrimination in credit transactions addressed.

Count V of the complaint alleges a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Defendant submits that this claim must be dismissed because Title VI does not apply to a discrimination claim arising from a program directly conducted by a federal financial agency, such as the farm credit programs at issue in this action. *See Williams v. Glickman,* 936 F.Supp. 1, 6 (D.D.C.1996) (holding that Title VI does not permit suits involving directly administered federal programs); *Soberal–Perez v. Heckler,* 717 F.2d 36, 38 (2d Cir.1983) (Title VI "was meant to cover only those situations where federal funding is given to a non-feder-

*Discrimination:*

### The Pigford and Green Plaintiffs are Not Similarly Situated [6]

 Plaintiffs allege that the defendant has denied and continues to deny them substantial and valuable credit opportunities that have been made available to other American farmers who, except for their race, are similarly situated. All of plaintiffs' claims in Counts II, V, VI, VII and VIII (which charge violations of the ECOA, Title VI, § 1981, § 1982 and the equal protection guarantee of the Fifth Amendment), in fact, are grounded on this allegation, which is in turn grounded on the same factual predicate, namely, that the USDA has discriminated against non-African American farmers on the basis of their race by not making available to them those certain credit benefits that it has agreed to provide to certain African American farmers via the *Pigford* settlement. That is to say, all of plaintiffs' claims of discrimination are based on the same allegedly discriminatory act, namely, the creation of the dispute resolution mechanism to resolve the individual claims of race discrimination raised by the *Pigford*

---

al entity which, in turn, provides financial assistance to the ultimate beneficiary").

Plaintiffs charge in Counts VI and VII, respectively, that defendant's discriminatory conduct violates 42 U.S.C. §§ 1981 and 1982. Defendant argues that Count VI is due to be dismissed because " § 1981 is inapplicable to alleged discrimination under color of federal law." *Davis–Warren Auctioneers, J.V. v. FDIC,* 215 F.3d 1159, 1161 (10th Cir.2000).

Count VIII alleges that defendant violated plaintiffs' rights to equal protection under the Fifth Amendment to the United States Constitution.

While the court concludes that the case should be dismissed for the reasons addressed in the text, the court does find that there is probable merit in each of the alternative bases for dismissal of Counts II, V, VI and VII.

**6.** While defendant suggests that this case must be dismissed as it constitutes an impermissible collateral attack on the consent decree in *Pigford,* the court is not persuaded that this is a basis for relief. "[I]it is now settled that a person or entity who was not a party to a prior proceeding resulting in a consent decree may initiate proceedings in a separate action to challenge actions taken pursuant to the consent decree where those actions may support a claim for violation of constitutional rights or other federal law, including the statute under which the consent decree was entered." *Township of South Fayette v. Allegheny County Housing Auth.,* 27 F.Supp.2d 582, 595 (W.D.Pa.1998) (citing *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)). The Supreme Court held in *Martin v. Wilks* that a nonparty may challenge a consent decree entered in a previous action through an independent action rather than through intervention. *Martin v. Wilks* was a Title VII case, and in the 1991 amendments to Title VII, Congress, in response to the Court's decision in *Martin v. Wilks,* expressly limited the ability of third parties to challenge consent decrees resolving claims of employment discrimination through a civil rights action by providing that a consent decree may not be challenged under the civil rights laws by a person who prior to the entry of the judgment had actual notice of the proposed judgment "sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain." 42 U.S.C. § 2000e–2(n)(1). The reasoning of *Wilks* "remains unaffected by the [amendments] to the Civil Rights Act." *Wilson v. Minor,* 220 F.3d 1297, 1302 (11th Cir.2000) (noting that *"Wilks* offers some support for the Plaintiffs' argument that the district court properly allowed them to bring an independent action challenging the 1988 injunction.").

Neither is the court here necessarily persuaded that transfer would be warranted even if the court were not otherwise of the opinion that plaintiffs' claims should be dismissed on other grounds. While plaintiffs do implicitly challenge the *Pigford* court's factual findings, they do not seek to undo what the court did in *Pigford* but rather seek for themselves the benefit of the relief granted to the plaintiff class in *Pigford.*

class members and the decision to award monetary and other relief to those who succeed on their claims. According to plaintiffs, by reason of the racially preferential remedial credit opportunities that the USDA has agreed to provide to African American farmers but which it has failed and refused to provide to non-African American farmers who have suffered the same abuses by the USDA in their credit transactions, plaintiffs are the victims of race discrimination.

Plaintiffs readily acknowledge that to prove their case under any of the discrimination theories advanced in their complaint, they must prove, first and foremost, "that the African American farmers that [the USDA] has chosen to favor suffered the same pattern of Unlawful Practices and abuses as Plaintiffs; in other words, Plaintiffs must show that they are similarly situated before their proof of race based disparate treatment becomes a matter of interest." However, and notwithstanding plaintiffs' conclusory assertions to the contrary, it is manifest that they are not similarly situated to the African American farmers that the USDA has "chosen to favor" via the *Pigford* settlement.

While it is necessary to focus on the specific conduct that plaintiffs challenge as discriminatory in considering whether they have alleged any cognizable claim for relief, it is essential in this case to also recognize that the plaintiffs allege that the USDA engaged in misconduct which they do not contend was discriminatory—and which they, in fact, contend was *not* discriminatory. More to the point, these plaintiffs charge, as did the plaintiffs in *Pigford*, that for the twenty years since January 1, 1981, they were the victims of maladministration and abuse by the USDA. They submit that they, like the African American farmers in *Pigford*, "have been denied applications made to

[the] Secretary ... for farm ownership loans for which they had great need and for which they were wholly eligible", that they have been refused operating credit and denied appropriate application processing, and have suffered unreasonable and unnecessary crippling delays in processing their applications, and in receiving the proceeds of loans that have been approved and/or have received approvals of their applications but in impracticably insufficient amounts, and with unreasonably restrictive conditions and/or have thereafter been denied appropriate loan servicing. In short, then, the plaintiffs herein charge that prior to the entry of the consent decree in *Pigford*, the Secretary indiscriminately mistreated African American and non-African American farmers alike, subjecting both to the same or substantially similar unlawful practices. According to these plaintiffs, though, by virtue of, and in the wake of the settlement in *Pigford*, the Department of Agriculture has knowingly, intentionally and consistently engaged in unlawful racial discrimination because it has failed and refused to provide them with the substantial equivalent of alternative Track A and Track B credit opportunities that it has made available to African American farmers, and has provided them with less favorable opportunities than it has provided to African American farmers, notwithstanding that these plaintiffs are similarly situated to those African American farmers in all respects except for their race.

In making this charge, plaintiffs pointedly ignore the fact that the basis for the plaintiffs' claims in *Pigford* was not simply that their applications for loans or credit services had been denied or otherwise mishandled by the USDA—a claim also made by the plaintiffs herein—but that the USDA had denied or mishandled their applications because they were African American. Indeed, plaintiffs' claims are

rooted in their insistence that both African American and non-African American farmers were mistreated by the USDA in the decades preceding *Pigford* and that African American farmers were not, in fact, victims of race discrimination at all. However, a review of the *Pigford* court's opinion approving the settlement leaves no doubt that the court believed otherwise. That court, in addressing the proposed settlement in light of the evidence and arguments presented at the fairness hearing, found that the USDA had discriminated against African American farmers *on the basis of race*. The court observed at the start of its opinion, that

> [f]or decades, despite its promise that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity of an applicant or recipient receiving Federal financial assistance from the Department of Agriculture," 7 C.F.R. § 15.1, the Department of Agriculture and the county commissioners discriminated against African American farmers when they denied, delayed or otherwise frustrated the applications of those farmers for farm loans and other credit and benefit programs. Further compounding the problem, in 1983 the Department of Agriculture disbanded its Office of Civil Rights and stopped responding to claims of discrimination. These events were the culmination of a string of broken promises that had been made to African American farmers for well over a century.

> It is difficult to resist the impulse to try to undo all the broken promises and years of discrimination that have led to the precipitous decline in the number of African American farmers in the United States. The Court has before it a proposed settlement of a class action lawsuit that will not undo all that has been done. Despite that fact, however, the Court finds that the settlement is a fair resolution of the claims brought in this case and a good first step towards assuring that the kind of discrimination that has been visited on African American farmers since Reconstruction will not continue into the next century. The Court therefore will approve the settlement.

185 F.R.D. at 85–86. En route to approving the settlement, the court specifically noted that the county committees which were responsible at the local level for approving or denying farm credit and benefit applications, "do not represent the racial diversity of the communities they serve," and the court observed that "[i]n several southeastern states, ... it took three times as long on average to process the application of an African American farmer as it did to process the application of a white farmer." *Id.* at 87. The court also noted that "a requirement frequently required of African American farmers but not routinely imposed on white farmers" was placement of loaned funds in a "supervised" account that required the signature of the county supervisor for withdrawal, *Id.* The court then commented,

> The denial of credit and benefits has had a devastating impact on African American farmers. According to the Census of Agriculture, the number of African American farmers has declined from 925,000 in 1920 to approximately 18,000 in 1992. CRAT Report at 14. The farms of many African American farmers were foreclosed upon, and they were forced out of farming. Those who managed to stay in farming often were subject to humiliation and degradation at the hands of the county commissioners and were forced to stand by powerless, as white farmers received preferential

treatment. As one of plaintiffs' lawyers, Mr. J.L. Chestnut, aptly put it, African American farmers "learned the hard way that though the rules and the law may be colorblind, people are not." Transcript of Hearing of March 2, 1999, at 173.

185 F.R.D. at 87–88. The court continued, stating,

> The Court cannot guarantee class members that they will never experience discrimination at the hands of the USDA again, and the Consent Decree does not purport to make such a guarantee. But the Consent Decree and the Court do provide certain assurances. First, under the terms of this Consent Decree, the USDA is obligated to pay billions of dollars to African American farmers who have suffered discrimination. Those billions of dollars will serve as a reminder to the Department of Agriculture that its actions were unacceptable and should serve to deter it from engaging in the same conduct in the future.

185 F.R.D. at 111. And in closing, the court stated,

> Forty acres and a mule. The government broke that promise to African American farmers. Over one hundred years later, the USDA broke its promise to Mr. James Beverly. It promised him a loan to build farrowing houses so that he could breed hogs. Because he was African American, he never received that loan. He lost his farm because of the loan that never was. Nothing can

completely undo the discrimination of the past or restore lost land or lost opportunities to Mr. Beverly or to all of the other African American farmers whose representatives came before this Court. Historical discrimination cannot be undone. But the Consent Decree represents a significant first step. A first step that has been a long time coming, but a first step of immeasurable value. As Mr. Chestnut put it, "Who really knows the true value, if there is one, for returning a small army of poor black farmers to the business of farming by the year 2000 who otherwise would never make it back? I am not wise enough to put a dollar value on that and I don't think anybody on this planet is wise enough to reduce that to dollars and cents." Transcript of Hearing of March 2, 1999 at 171. The Consent Decree is a fair, adequate and reasonable settlement of the claims brought in this case. It therefore will be approved and entered.

185 F.R.D. at 112–13.

Plaintiffs' arguments in this case wholly fail to account for the *Pigford* court's findings of race discrimination as a basis for its approval of the consent decree. Furthermore, while the plaintiffs acknowledge that there exists substantial documentation which tends to show that there were "gross failures within the Office of Civil Rights Enforcement and Adjudication at USDA," [7] plaintiffs' arguments in this case

---

**7.** The court observed,

> Any farmer who believed that his application to those programs was denied on the basis of his race or for other discriminatory reasons theoretically had open to him a process for filing a civil rights complaint either with the Secretary of Agriculture or with the Office of Civil Rights Enforcement and Adjudication ("OCREA") at USDA. USDA regulations set forth a detailed pro-

> cess by which these complaints were supposed to be investigated and conciliated, and ultimately a farmer who was unhappy with the outcome was entitled to sue in federal court under ECOA. *See Pigford v. Glickman*, 182 F.R.D. 341, 342–44 (D.D.C. 1998). All the evidence developed by the USDA and presented to the Court indicates, however, that this system was functionally nonexistent for well over a decade. In 1983,

also entirely fail to consider that the plaintiffs in *Pigford* complained not only that they were the victims of race discrimination but also that the Secretary's gross mishandling of civil rights complaints filed by African American farmers with the Secretary resulted in the inability of these persons to timely pursue their claims of discrimination with the Secretary and contributed to what the *Pigford* court considered the potential inability of African American farmers to establish their discrimination claims through the usual judicial processes. Plaintiffs dismiss the problems with the civil rights complaint process as having little bearing on any evaluation of the circumstances of the respective parties in *Pigford* and in this case. Yet the admitted failure of the USDA's civil rights enforcement procedures, and the impact of that failure on the *Pigford* plaintiffs' claims, were among the principal consider-

ations which led to the *Pigford* court's decision to certify the class and to approve the settlement.[8] That is to say, the *Pigford* court determined that the remedy proposed by the parties was fair and reasonable not only because the record contained what it considered to be substantial evidence of racial discrimination in the Secretary's administration of the USDA's farm loan programs, but also because the USDA's discrimination complaint process was all but nonexistent.

In their insistence on the viability of their claims, plaintiffs also ignore the fact that the *Pigford* class did not even include all African American farmers whose applications for credit were denied, or even all African American farmers who may have believed that their applications were denied on account of race, but rather included *only* African American farmers whose

---

OCREA essentially was dismantled and complaints that were filed were never processed, investigated or forwarded to the appropriate agencies for conciliation. As a result, farmers who filed complaints of discrimination never received a response, or if they did receive a response it was a cursory denial of relief. In some cases, OCREA staff simply threw discrimination complaints in the trash without ever responding to or investigating them. In other cases, even if there was a finding of discrimination, the farmer never received any relief.
. . .
Also in February of 1997, the Office of the Inspector General of the USDA issued a report to Secretary Glickman stating that the USDA had a backlog of complaints of discrimination that had never been processed, investigated or resolved. See Pls' Motion for Class Certification, Exh. A (Evaluation Report for the Secretary on Civil Rights Issues). The Report found that immediate action was needed to clear the backlog of complaints, that the "program discrimination complaint process at [the Farm Services Agency] lacks integrity, direction, and accountability," *id.* at 6, and that "[s]taffing problems, obsolete procedures, and little direction from manage-

ment have resulted in a climate of disorder within the civil rights staff at FSA." *Id.* at 1. *Pigford*, 185 F.R.D. at 88.

8. The court observed that,

Most members of the class lack documentation of the allegedly discriminatory transactions at issue. Without any documentation of those transactions, it would be difficult if not impossible for an individual farmer to prevail in a suit in federal court under a traditional preponderance of the evidence standard. The parties acknowledge, however, that it is not the fault of class members that they lack records. Since class members' lack of documentation is at least in part attributable to the passage of time which has been exacerbated by the USDA's failure to timely process complaints of discrimination, there is a common issue of whether and how best to provide relief to class members who lack documentation, and that common issue "predominate[s] over any questions affecting only individual members." See Rule 23(b)(3), Fed.R.Civ.P. This class action and its settlement as proposed in the Consent Decree provide a mechanism to address that common issue. *Pigford*, 185 F.R.D. at 94.

claims were denied during the relevant time frame (January 1, 1981 through July 1, 1997) *and* who actually "filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application."[9]

Finally, and perhaps most significantly, plaintiffs fail to address at all the fact that while the USDA consented in *Pigford* to a dispute resolution process for the claims of all *Pigford* class members who wished to avail themselves of that process, it did not consent to provide all class members with any actual remedial relief. Rather, the USDA agreed only to provide a remedy to class members who are able to demonstrate, at least by substantial evidence, that the Department discriminated against them on account of their race. Thus, while the USDA may have agreed to provide remedial credit opportunities to certain specific identifiable African American farmers, many other African American farmers have been and will be denied such opportunities.[10]

In sum, plaintiffs' arguments in this case completely ignore the fact that the issue in *Pigford* was not just mistreatment or abuse by the USDA of American farmers, but rather mistreatment and abuse of *African American* farmers *because of their race*. Thus, plaintiffs' position respecting the USDA's allegedly "discriminatory" act—i.e., its agreement to provide valuable

benefits to African American farmers—is not well grounded, for it does not fully account for the context in which the *Pigford* consent decree came into existence and achieved court approval, nor does it take into account the precise parameters of the class certified in *Pigford* or the specific relief afforded by the consent decree or the fact that the valuable credit opportunities to which the plaintiffs seek access were not made available by the *Pigford* consent decree to all African American farmers or even all the class members, but only to class members who could establish that they were victims of racial discrimination.

The court's point is simply this: It is not race alone that distinguishes the plaintiffs in this case from the individuals to whom the USDA has agreed via the *Pigford* consent decree to provide remedial credit opportunities, but rather it is the fact that those individuals are African American *and* that they made a timely complaint of *race* discrimination to the USDA *and* that they are able to prove that the USDA denied them a benefit *because of* their race. In other words, it is *proof* of race discrimination, and not simply membership in a racial group, that distinguishes successful *Pigford* class members from the plaintiffs herein. The USDA has not merely chosen to favor African American

---

**9.** The court certified a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure defined as:

> All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding

USDA's treatment of such farm credit or benefit application.

**10.** Indeed, according even to plaintiffs, the process to which the USDA agreed has not resulted in the virtually automatic success for *Pigford* class members that many had anticipated at the time the settlement agreement was reached, and the claims of many of the *Pigford* class members have been rejected by the third-party adjudicator. For example, as of February 25, 2000, there had been decisions in 9,573 Track A cases, of which 5,746 were granted; the remaining 3,827 were denied in whole or in part.

farmers who prove that they were denied credit benefits, but instead, upon being confronted with what the *Pigford* court considered to be substantial evidence of a pattern and practice of racial discrimination against African Americans, has agreed to provide a remedy to African American farmers within the class who are able to make the requisite showing of discrimination. Thus, as plaintiffs do not allege that the USDA ever denied them credit or credit services on account of their race at any time prior to the *Pigford* consent decree, and they do not allege that they filed prior to this lawsuit any claim of race discrimination regarding the USDA's treatment of any farm credit or benefit application, then they cannot show that they are similarly situated to the *Pigford* farmers to whom the USDA agreed to provide valuable credit opportunities as a remedy for race discrimination practiced against them.

■ The court would note additionally that even assuming that, in fact, the *Pigford* court's findings of historical racial discrimination were not well founded and that there was no systemic discrimination in that the USDA abused or mistreated both African American and non-African American farmers in the administration of its farm credit programs, plaintiffs herein still would have stated no cognizable claim for relief inasmuch as their allegations do not support a conclusion that they have been injured as a result of the USDA's decision to allow African American farmers to attempt to establish their individual claims of discrimination via an alternative dispute resolution mechanism that has not been made available to these plaintiffs. The substantive relief which the *Pigford* consent decree provides is available only to class members who prove race discrimination, and consequently, the relief made available to successful *Pigford* class members does not work any race-based injury to the plaintiffs herein.[11] *See Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 700 n. 7 (9th Cir.), *cert. denied*, 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997) ("[W]hen ... a state gives identified victims of state discrimination [benefits] that were wrongly denied them, the beneficiaries are not granted a preference 'on the basis of race' but on the basis that they have been individually wronged."); *Associated Gen'l Contractors of Ca., Inc. v. City and County of San Francisco*, 748 F.Supp. 1443, 1455 (N.D.Ca.1990) ("[A] remedy that goes to the actual victim is not race conscious at all; it is victim conscious."), *aff'd*, 950 F.2d 1401, 1403 (9th Cir.1991); *cf. Williams v. City of New Orleans*, 729 F.2d 1554, 1557 (5th Cir.1984) (noting that "the use of quotas or goals under Title VII without regard to specific victims as one means to remedy past discrimination has been upheld regularly throughout the federal courts of appeals").[12]

---

11. This fact, among others, distinguishes this case from *Moore v. United States Department of Agriculture (Moore I)*, 993 F.2d 1222 (5th Cir.1993), and *Moore v. United States Department of Agriculture (Moore II)*, 55 F.3d 991 (5th Cir.1995).

12. The Supreme Court has recognized that in order to remedy the effects of prior discrimination, it may be necessary to take race into account. As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy. "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." [*Fullilove v. Klutznick*, 448 U.S. 448, 484, 100 S.Ct. 2758, 2778, 65 L.Ed.2d 902 (1980)], quoting *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 777, 96 S.Ct. 1251, 1270, 47 L.Ed.2d 444 (1976). *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280–81, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986). However, while "race-conscious re-

For the foregoing reasons, the court

medial action may be necessary" to eliminate the vestiges of prior discrimination, *id.*, at 277, 106 S.Ct. at 1848 (citing *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971)), public entities "must act in accordance with a 'core purpose of the Fourteenth Amendment' "—or in the case of the federal government, with the core purpose of the equal protection component of the Fifth Amendment—"which is to 'do away with all governmentally imposed discriminations based on race.' " *Id.* (citing *Palmore v. Sidoti*, 466 U.S., at 432, 104 S.Ct., at 1881–1882); *see also Rodrigues–Silva [Rodriguez–Silva] v. I.N.S.*, 242 F.3d 243 (5th Cir.2001) ("The Due Process Clause of the Fifth Amendment applies to the federal government a version of equal protection largely similar to that which governs the states under the Fourteenth Amendment."). The Court in *Wygant* remarked that

> [t]hese related constitutional duties are not always harmonious; reconciling them requires public employers to act with extraordinary care. In particular, a public employer like the Board must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination. Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees. In this case, for example, petitioners contended at trial that the remedial program—Article XII—had the purpose and effect of instituting a racial classification that was not justified by a remedial purpose. 546 F.Supp., at 1199 (E.D.Mich. 1982). In such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.

*Wygant*, 476 U.S. at 277–78, 106 S.Ct. at 1848–49. The Court ultimately held that race-conscious remedial action is subject to strict scrutiny, and may only be upheld if it is necessary to further a compelling government interest and the means used to accomplish that purpose are narrowly tailored. *Id.* at 274, 106 S.Ct. at 1847. The Fifth Circuit in *Walker v. City of Mesquite*, 169 F.3d 973, 982 (5th Cir.1999), reiterated that

> [a]ny race-conscious remedial measure receives strict scrutiny under the Equal Protection Clause. *See Adarand*, 515 U.S. at 227, 115 S.Ct. at 2113[, 132 L.Ed.2d 158 (1995)]; *Black Fire Fighters Ass'n v. Dallas*, 19 F.3d 992, 995 (5th Cir.1994).... This is true no matter which race is burdened or benefitted by the racial classification in question. *See Adarand*, 515 U.S. at 224, 115 S.Ct. at 2111 (citing *Croson*, 488 U.S. [469] at 494, 109 S.Ct. [706] at 722[, 102 L.Ed.2d 854 (1989)] ). Strict scrutiny requires that a racial classification be (1 justified by a compelling government interest and (2 narrowly tailored to further that interest. *See Adarand*, 515 U.S. at 227, 115 S.Ct. at 2113.
>
> . . .
>
> In assessing whether a remedy is narrowly tailored, courts are to assess five factors: (1) the necessity for relief, (2) the efficacy of alternative remedies, (3) the flexibility and duration of relief, (4) the relationship of the numerical goals to the relevant market, and (5) the impact of the relief on the rights of third parties.

*Walker*, 169 F.3d at 982. In the case at bar, this court does not view the creation of the two-track mechanism for dispute resolution as a substantive "remedy"; rather, it merely created a method of resolving the individual class members' claims of race discrimination to determine whether those persons were entitled to a remedy. It is a procedure; not a remedy, race-conscious or otherwise. And while the procedure does provide for a lesser showing than would be required of the *Pigford* farmers had they proceeded to trial before the court, the *Pigford* court concluded that this was reasonable under the circumstances, and in particular based on its view that the Secretary's mishandling of the *Pigford* plaintiffs' administrative complaints of discrimination contributed to the plaintiffs' potential inability to demonstrate discrimination by the usual preponderance of the evidence standard.

concludes that plaintiffs'. discrimination claims against defendant should be dismissed.

*Administrative Procedures Act:*

In addition to their claims against the USDA for race discrimination, plaintiffs assert claims under the Administrative Procedures Act (APA), 5 U.S.C. §§ 551–559, 701–706, in Counts III and IV of their complaint for defendant's allegedly having "arbitrarily and capriciously" denied their applications for loans or loan servicing and/or having failed to follow agency regulations. The APA provides a cause of action for persons aggrieved by a "final agency action," and provides for judicial review of such action. *See* 5 U.S.C. § 702 ("A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof."); 5 U.S.C. § 704 (limiting court to review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court.").

Defendant seeks dismissal of plaintiffs' putative APA claims on a number a bases, among which is the contention that plaintiffs' APA claims are time-barred by virtue of the six-year statute of limitations contained in 28 U.S.C. § 2401(a) since plaintiffs have not pled a claim of arbitrary or capricious agency action under the APA that falls within the limitations period. In response to defendant's motion, plaintiffs argue that to the extent they have asserted APA claims relating to the USDA's discriminatory provision of remedial credit opportunities to African American farmers, their claims are clearly timely, as plaintiffs' claims on account of such conduct accrued at the earliest in January 1999 when the settlement of *Pigford* was announced. However, to the extent that plaintiffs are attempting to assert an APA claim based on alleged discrimination by

the USDA in relation to the settlement of *Pigford*, their claims, whether or not they would be considered timely, are due to be dismissed for the reasons heretofore addressed.

■ Plaintiffs further submit that their APA claims as they relate to the USDA's conduct preceding *Pigford* must be considered timely since plaintiffs have pled that their claims and "Defendant's offenses . . . arise out of a continuing and interconnected series of transactions or occurrences" and that no period of limitations runs "so long as Defendant's offense has continued." The court, however, is of the opinion that the continuing violation theory upon which plaintiffs are apparently basing their position does not apply to actions brought under the APA, since the APA provides only for review of "final agency action," which by definition cannot be of a continuing nature.

■ Plaintiffs' further argument that their claims may be deemed timely by reference to principles of equitable tolling is likewise unavailing. Plaintiffs specifically acknowledge that they "have known for years that they were being abused by the Secretary." But they

> had no knowledge or reason to know of the claims they make today until creative and resourceful counsel in *Pigford* brought to light the Secretary's systematic course of denying eligible farmers' applications for credit, providing late and unreasonably inadequate amounts the credit that was extended, and even then encumbered by unreasonably restrictive conditions, and, thereafter, when problems arose, denying appropriate loan servicing.

The fact that plaintiffs may not have been aware of the means by which to seek legal redress for the alleged abuse which they concede they knew they were suffering is

not a basis for applying equitable tolling to their claims.

Accordingly, the court concludes that these Counts should be dismissed.

*Declaratory Judgment:*

As Count I of plaintiffs' complaint seeks relief under the Declaratory Judgment Act and does not state a claim independent of plaintiffs' other counts, then given the failure of those other counts, this count, too, is due to be dismissed.

*Conclusion:*

Irrespective of what the attorneys involved in this suit may have understood, believed or expected with regard to the outcome of the present motion, the court has little doubt that many of the plaintiffs and potential plaintiffs may not have anticipated this result. The court also recognizes that many, most or all of these plaintiffs and potential plaintiffs may well believe that they have been grievously wronged by actions by the USDA in connection not only with their own loans but relative to the disposition of the *Pigford* case. While the court in that respect is regretful of the decision it makes today, the court is nevertheless of the view that under the law, the conclusion it has reached to dismiss the case is the correct conclusion.

Accordingly, it is ordered that defendant's motion to dismiss is granted.